24, 2431 Rubenstein v. Martel Good morning, your honors. My name is Miriam Tauber and I represent the plaintiff shareholder in this case. This case involves an agreement that provided for Travelzoo, the company, to issue shares of stock to the defendant, Ralph Martel, and his wholly owned company, or trust, in exchange for Mr. Martel's sale of his privately owned company, different company, to Travelzoo in payment of a cash purchase price. The executed agreement, approved by the board and shareholders in this case, permitted Mr. Martel to pay up to 80% of the purchase price by promissory note, but only if he first resigned from the board. The purpose of that resignation requirement was to avoid the conflict of interest that the board determined would arise from Mr. Martel's service as a director at the same time as he owed the money under the promissory note to the company. The district court in this case agreed with Mr. Martel's defense that the transaction was exempt under SEC Rule 16b-3. Respectfully, that decision is incorrect because SEC Rule 16b-3 only applies to transactions between a company and an officer or director of the company. The transaction in this case was not a transaction between the company and the director because Mr. Martel was required to resign from the board as a condition to closing the transaction. Wasn't that requirement to resign conditional on whether, what type of payment form the purchase of the stock would entail? Yes, that requirement, well, I wouldn't say their company was conditioned on that. The requirement said that if Martel elected to pay by promissory note, he would have to execute a resignation letter along with the promissory note. So the promissory note would not be accepted and signed by the company as accepted on the line if the resignation letter was not delivered alongside it. So if he had not elected that method of payment, then he wouldn't have to resign and there wouldn't be an issue, correct? Correct. So just to sort of fast forward to that point, the district court had held that this agreement was effective in the date of the execution of the agreement. Because, sort of like I think we were going with this, which is what Mr. Martel has argued, which is that he was forced to go through with the transaction anyway and it was just a matter of whether he would choose to pay by note or choose to pay by cash. And if he chose the cash option, he wouldn't have to resign. The issue with this is that the execution of the agreement was conditioned on many things. It didn't just straightforwardly say, look, this is the only condition to closing is your election to pay by cash or note and then to resign if you pay by note. There was lots of conditions to closing. There was, like in every merger agreement, the parties had to show up at the closing and sign binding closing documents, which in those documents had representations, warranties, there were no regulatory objections. In this case, Mr. Martel was required to pay the 20% of the cash purchase price two days prior to closing, which didn't happen until months after. I mean, the agreement and the transaction had been approved by a special committee of the board of directors of the company, right? Correct. So in this case, the agreement was executed and then the shareholders approved the agreement. And then after that- So the major substantive obstacles to the closing, I mean, had been eliminated. Those were the substantive obstacles. Then there were some ministerial things that would happen. But if they had failed to go forward with the closing, they would have been very potentially liable to suit, right, for breach of contract because the substantive material conditions had been satisfied. Sure. Well, so to that point, I would say in cases where courts have had these ministerial acts or the only outstanding condition or outstanding closing terms, let's just say, I wouldn't call them conditions, in those situations, the parties have both paid the full purchase price or relinquished their shares to an escrow agent or to a third party, the brokerage they're using to execute the brokerage transaction. They no longer have anything to do except wait for their delivery. Would there have been a sound breach of contract action had they failed to close? In that case, there wouldn't have been a situation of failing to close because all of the closing deliverables are outside the hands of the parties in those cases. So it's just sort of like an escrow agent will then apply the formula of the contract on the day that the closing is to occur. Would there have been a sound, plausible breach of contract action- In this case. Yes, had they failed to close after the special committee approved the transaction? The answer to that is I don't know. Only because, for example, there were other closing conditions like the delivery of representations and warranties. Mr. Bartel, in this case, had to eliminate certain debts that were held by the company he was selling to Travelzoo before closing. If he, let's say, showed up at closing and said, well, I did 9 out of 10 of those things, but I couldn't do this last thing because of some other thing with the bank or whatever reason he gave. And he said, but that's not material. And the counterparty of Travelzoo disagreed and said, oh, no, that's very important to us. So maybe there would be a breach of contract. Maybe it would be sort of an impossibility that made the contract not able to happen. This is why there was no binding transaction until closing. This goes to exactly that point. Because even though it's executed and approved by the shareholders, there are so many unknowns that have to be resolved at the closing. And the only way to really know that those conditions have been satisfied is when the parties show up and sign on the line saying they acknowledge the conditions were satisfied. And so there's nothing else to be done. And maybe they're not satisfied. Maybe at that point, when they sign the line, they're saying they're waiving them. And either way, at that point, there's no further conditions and there's a binding agreement. Would the policy objectives of the exemption created in Rule 16B and 16B3D be undermined by affirming the district court's ruling here that there was an irrevocable commitment? Yes, thank you for raising that. My second, I would say, main point of this appeal is that this court has held in the Hoppe case that the rationale of this rule is that there are common law fiduciary duties owed by officers and directors to the company that provide an additional constraint on the transactions with the company apart from Section 16. And so those fiduciary duty constraints plus the other requirements of the rule, which are shareholder approval, is one example, could be board approval, could be ratification of the next shareholder meeting, all the various criteria they have, along with these independent fiduciary duty constraints are a sufficient check on the abuses that Section 16 is aimed to prevent. But, you know- So just so I understand, is your argument that Mr. Bartel had to be a director at the moment of closing? What's the exact timing that would satisfy- The rule in your argument? I believe this court in a prior case has held that the minutes of timing of the resignation are actually important. And I think the prior case was a half an hour. In this case, I would say it's not a technicality, it's, you know, the board- Isn't the difference moments before or at? Is that what we're fighting about? The exact terms of the agreement here said that basically the board would refuse to accept a promissory note as payment unless it had a resignation letter with it. And the promissory note's not effective until it's signed by both parties. So is this actually then about the order in which the documents were signed at closing? Is that what we're fighting for? Well, I mean, the closing, the binding commitment happens and is evidenced by the set of closing documents, right? When those documents are signed, that's when you know the transaction is going to happen. It's unconditional. It binds both parties. So your argument is that no sooner than that? Correct. There's no binding in a minute until the closing documents are signed. And that's what the shareholders understand as well. The shareholders of Travel Zoo read the proxies. They understand that there's closing conditions, and it might not happen until the closing. In that period between approval and closing, there's all kinds of things the parties have to do. And the other sides have to be satisfied the parties did them. And, you know, there might still be uncertainty about whether this transaction actually happens and the terms which the transaction takes until the moment of closing. And that's why there's this principle that's been applied consistently across the board that merger agreements and other conditional transactions are not effective under 1616 until closing. Thank you, counsel. Reserved two minutes for review. Thank you. Good morning, Your Honors. May it please the Court, Jeff Brooks from Morrison-Cohen for the defendant, Apolise Ralph Bartel, the Ralph Bartel 2005 Trust, and Azuro Capital, Inc. The key issue here, the key question, and the question that was resolved correctly by the magistrate judge and by the district court, is when did Mr. Bartel and Azuro become committed to this transaction? The law is clear that when the purchase for purposes of 1616. Irrevocably committed. Isn't the phrase irrevocably committed? Yes. Not just committed. Irrevocably committed, and so that they would no longer be able to use inside information to manipulate the terms of the transaction. Here, as the district court correctly held, that commitment occurred when Mr. Bartel signed or Azuro signed the stock purchase agreement on November 25th. Subsequently to that, on December 29th, or 28th rather, the shareholders approved the transaction. At that point, Mr. Bartel and Azuro remained bound. Then there's an actual closing on December 30th. It's not a closing where anyone got together and signed documents. They exchanged their signed copies of things. The special committee signed, approved it a few weeks before that. Doesn't that have some significance, too? In Rule 16b3d, it's one of the ways that it can be, you can fall under that exemption. It's either a shareholder vote or approval of a special committee. Here we had both, and the special committee actually approved it before Mr. Bartel signed, which is why it wasn't in that timeline of events. So the question here is, when did he become irrevocably bound to this transaction so that he couldn't manipulate it anymore? And the answer is, at least by the closing, he was bound. When they went to transmit their copies of the signed documents, he was committed. He didn't have any way to manipulate it. He didn't have any way to manipulate it after the document was signed on November 25th. I think Ms. Tauber would say, but in fact, the transaction could still have not gone through. And so it wasn't done. The transaction could not have gone through only if he had no way to scuttle the transaction himself. He was contractually obligated to do it. So if he didn't do certain things. If the representations and warranties had been brought down to date or something like that, the transaction could have been either postponed or scuttled. Yes, but he would have been in breach. So the question is not whether the transaction is guaranteed to close no matter what. The question is whether he is legally bound to this agreement and he can't change it on his whim. Here he could not. The purchase price was set. The terms were set. The representations and warranties were set. Everything he had to do, he was obligated to do. There wasn't anything that was left to his own choice other than if he wanted to pay for part of the purchase price with a promissory note, then he would have to also resign as a director. So that was the only choice that he had. But it was an either or. It wasn't an option to get out of the transaction. He couldn't just give him a promissory note and then refuse to resign because that would be a breach of the agreement that he signed. So your notion is that he'd been deprived by that point of any ability to benefit by insider information or to contravene the other purposes of the rule? That's correct, Your Honor. So this standard about being irrevocably bound and unable to manipulate the transaction, that's the standard in every kind of case, even ones involving a merger, which this sort of did. But most of the case law involving mergers involves mergers of public companies, and they're talking about things that make a contingent like approval by the Department of Justice or shareholder votes, which we had here but was already fulfilled. There was nothing special about the fact that there was a merger related to this that changes that rule here. And I also wanted to say that there's nothing in the case law. Plaintiff's counsel talks about this, oh, it wasn't ministerial because in other cases, well, she says sometimes it's out of the hands of the party where there's an escrow agent and everything just happens automatically. But there's nothing in the case law that says it has to only be ministerial and be automatic and not related to you at all or involve an escrow agent. None of those things are actually required by any of the case law. All that matters is that he's actually contractually committed to do it. I also wanted to mention about the fiduciary duty point that plaintiffs make. And I think in their papers, they conflate two different things on the fiduciary duty point. It was decided that Mr. Bartel would have to resign as a director if he paid for the purchase in part with a promissory note. Because going forward, if that happened, he would then be a director of the company and he would also be a borrower against the company, right? So he would have a potential conflict of interest in anything involving that note in the future. So he agreed that he would resign while that note was outstanding. Plaintiffs in their papers have tried to conflate that with him not having the requisite fiduciary duty at the time of this transaction. But those are entirely separate issues, right? The rule of 16b3d looks to whether you're a director at the time and whether the transaction is with an issuer on the other side and whether the issuer is, you know, whether it's approved by independent directors or the shareholders. And the SEC has determined that that's, if you have that approval, then that's sufficient protection from the director abusing any inside information he has because the counterparty is the issuer who also has inside information and the shareholders are aware of it and they approve it. So all of that happened here, right? He was a director at the time. All that happened. And the fact that he was agreeing in the future he might have a conflict of interest about a promissory note that he wouldn't pay until the closing doesn't in any way impact that analysis. And the thing that the SEC and Congress in passing this 16b were seeking to protect is the abuse of insider information in the transaction. They're not looking to whether he would have a conflict of interest on some promissory note down the road. Those things just have no relation to each other. Mr. Bartel then did go on in the following six months to affect transactions in the company's stock that he profited by, right? Yes, he did. As was anticipated at the time. Even in the shareholder agreement, they agree that they will file a registration statement for a portion of the shares so that he would be able to then sell those to the public. And the company did file that registration statement and then he did sell, I think he purchased three and a half million shares and he sold 500,000 of them four and a half months later or something. So that was all known to the parties and the registration statement issued and those rules complied with. Yes, and under rule 16b, you have to have two non-exempt sales, right? You have to have a purchase and a sale that match that are not exempt. So that transaction would be non-exempt, but because the initial transaction was exempt, there's not match sales here so there's no liability. Finally, in my final minutes, I just want to say that there was some talk in the papers about the resignation letter not having been produced. Of course, this case is before the court on a pre-discovery motion to dismiss, so nothing has been produced. And there's no mystery about what the resignation letter said. It said what it had to say, which is laid out in the stock purchase agreement. It says he has to resign while the promissory note is out. And finally, the application or the failure to apply 16b-3 here would be a very hyper-technical application of the rule and the statute in a way that I don't think was intended by Congress or the SEC in promulgating that rule. I mean, the plaintiffs concede that Mr. Bartel was a director all the way up to the very moment of closing. That's when the resignation letter is transmitted. He's a director all the way up to that point. If that makes the transaction exempt right until then, the fact that he's not a director after that, there's no policy reason to draw a hyper-technical line there. And again, to clarify, under the law, that's not even what you look at. You just look at when he's irrevocably bound, which is earlier than that. But even if you assume that they were right, that you have to look only at the moment of closing, there's no reason to be hyper-technical. There's no policy goal that would be forwarded by that to say, oh, well, sure, it would have been exempt two minutes before. But now two minutes later, we're worried about some insider information that he might have had. That risk just does not exist. And there's no reason to be hyper-technical, even if they were right, which they weren't, because actually the date to look for is when he signed the agreement, which is when he was legally bound. Thank you. Thank you, counsel. We'll hear rebuttals. Thank you. The first thing I want to respond to is that the predicate of the district court's opinion that the exemption applies is that the agreement was effective at the time of execution. The agreement could not have been an effective 16-B transaction at execution because, as Mr. Bertalli's counsel concedes and just conceded, that at that time there still was sterile door approval that had to take place, which, at the very least, that's a material condition that the agreement would never have pursued without that. And the rule requires shareholder approval to be prior to the transaction. So it's not possible that as soon as the shareholders approve the transaction, it qualifies for the exemption and the transaction is effective. Because if it were effective at that moment, it wouldn't qualify. But that is in our situation here. Well, in other words, I mean, we shouldn't spend time, I don't think, quibbling about whether it was irrevocable commitment at the time the agreement was signed or when the shareholder approval, because your position is it was not irrevocable until the actual documents were signed and transmitted, and closing it was done, right? Correct. That is exactly what my point is. The other point I want to mention is it's not this hypertechnical application of the statute. Mr. Bartel was an insider not only because he was a director and officer, but because he was a 10% shareholder. And under the statute, under this court's holdings, 10% shareholders have an equal opportunity for speculative abuse, or may not equal, but almost as equal to directors and officers. But they don't have that additional fiduciary duty constraint, which is important. That fiduciary duty, the issue about him applying to resign prior to closing is also not technical, but it served a purpose. That fiduciary duty that acts as a constraint on officers and directors did its job in this case, because the board said you actually can't proceed with this transaction on these terms if you have fiduciary duty. In order to proceed with this transaction on these terms, you have to resign. And because he had to resign and abandon those fiduciary duties, he doesn't qualify for the exemption, which depends upon him having a fiduciary duty. Thank you, counsel. Thank you both. We'll take the case in the classroom.